# UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF MISSOURI

| | | |
|---|---|---|
| H&R BLOCK EASTERN ENTERPRISES, INC., HRB INNOVATIONS, INC., AND H&R BLOCK ENTERPRISES LLC | ) ) ) ) | Case No. 13-CV-00072 |
| Plaintiffs, | ) ) | |
| v. | ) ) | ORAL ARGUMENT REQUESTED |
| INTUIT, INC., | ) ) | |
| Defendant. | ) ) | |
| | ) | |

### SUGGESTIONS IN SUPPORT OF PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER AND REQUEST FOR PRELIMINARY INJUNCTION

# TABLE OF CONTENTS

I.    INTRODUCTION ................................................................................................. 1

II.   FACTUAL BACKGROUND ................................................................................. 2

      A.   The Parties ................................................................................................. 2

      B.   Value of the H&R Block® Trademark ...................................................... 2

      C.   Defendant's False and Misleading Advertising Campaign ....................... 3

III.  STANDARD FOR GRANTING INJUNCTIVE RELIEF ................................. 8

IV.   H&R BLOCK IS LIKELY TO SUCCEED ON THE MERITS........................ 9

      A.   Defendant's False and Misleading Campaign Constitutes False
           Advertising and Unfair Competition Under Federal Law ...................... 9

           1.   Defendant's Advertisements Are Literally False.................................. 10

           2.   Defendant's Advertisements Have a Tendency to Deceive
                Consumers......................................................................................... 13

           3.   Defendant's Advertisements Are Likely to Affect Purchasing
                Decisions........................................................................................... 13

           4.   Defendant's Advertising Affects Interstate Commerce ...................... 14

           5.   H&R Block Will Be Injured by the Campaign ................................... 15

      B.   Plaintiffs Are Likely to Prevail on Their Additional Claims for Trademark
           Infringement and Unfair Competition Under Missouri State Law ...................... 16

V.    PLAINTIFFS WILL BE IRREPARABLY HARMED IF THE COURT DOES
      NOT GRANT THE INJUNCTIVE RELIEF SOUGHT.................................... 17

VI.   THE THREATENED INJURY OUTWEIGHS ANY HARM TO DEFENDANT ........ 19

VII.  THE PUBLIC INTEREST STRONGLY FAVORS AN INJUNCTION HERE............. 19

VIII. CONCLUSION..................................................................................................... 20

Case 4:13-cv-00072-FJG   Document 7   Filed 01/25/13   Page 2 of 26

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Allsup, Inc. v. Advantage 2000 Consultants Inc.,*
428 F.3d 1135 (8th Cir. 2005) ........................................................................10, 13

*Am. Dairy Queen Corp. v. New Line Prods, Inc.,*
35 F. Supp. 2d 727 (D. Minn. 1998) ......................................................................18

*Calvin Klein Cosmetics Corp. v. Lenox Laboratories,*
815 F.2d 500 (8th Cir. 1987) ..................................................................................18

*Castrol, Inc. v. Pennzoil Co.,*
799 F. Supp. 424 (D. N.J. 1992) ............................................................................11

*Coca-Cola Co. v. Purdy,*
382 F.3d 774 (8th Cir. Minn. 2004) .......................................................................19

*Connelly v. ValueVision Media, Inc.,*
393 F. Supp. 2d 767 (D. Minn. 2005) ..............................................................19, 20

*Cornucopia, Inc. v. Wagman,*
710 S.W.2d 882 (Mo. Ct. App. 1986) ....................................................................16

*Dakota Indus., Inc., v. Dakota Sportswear, Inc.,*
988 F.2d 61 (8th Cir. 1993) ......................................................................................9

*Dataphase Sys., Inc. v. C L Sys., Inc.,*
640 F.2d 109 (8th Cir. 1981) ................................................................................8, 9

*EFCO Corp. v. Symons Corp.,*
219 F.3d 734 (8th Cir. 2000) ..................................................................................14

*Emerson Elec. Co. v. Rogers,*
418 F.3d 841 (8th Cir. 2005) ....................................................................................8

*Ethex Corp. v. First Horizon Pharm. Corp.,*
228 F. Supp. 2d 1048 (E.D. Mo. 2002)..................................................................10

*Franchised Stores of New York, Inc. v. Winter,*
394 F.2d 664 (2d Cir.1968)....................................................................................15

*J & B Wholesale Distrib., Inc. v. Redux Beverages, LLC,*
621 F. Supp. 2d 678 (D. Minn. 2007)....................................................................20

-ii-

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

*McNeilab, Inc. v. American Home Products Corp.*,
848 F.2d 34 (2d Cir. 1988)......................................................................15, 16, 18

*Mut. of Omaha Ins. Co. v. Novak*,
775 F.2d 247 (8th Cir. 1985) ................................................................20

*N.I.S. Corp. v. Swindle*,
724 F.2d 707 (8th Cir. 1984) ................................................................9

*Pan American Realty Corp. v. Forest Park Manor, Inc.*,
431 S.W.2d 144 (Mo. 1968) ................................................................17

*Porous Media Corp. v. Pall Corp.*,
110 F.3d 1329 (8th Cir. 1997) ................................................................16, 18

*Rhone-Poulenc Rorer Pharm., Inc. v. Marion Merrell Dow, Inc.*,
93 F.3d 511 (8th Cir. 1996) ................................................................10, 13

*S.C. Johnson & Sons, Inc. v. Clorox Co.*,
930 F. Supp. 753 (2d Cir. 1996) ................................................................11

*Sanborn Mf'g Co., Inc., v. Campbell Hausfeld/Scott Fetzer Co.*,
997 F.2d 484 (8th Cir. 1993) ................................................................8

*Sports Design and Dev., Inc. v. Schonenboom*,
871 F. Supp. 1158 (N.D. Iowa 1995)................................................................19, 20

*Time Warner Cable, Inc. v. DirecTV, Inc.*,
497 F.3d 144 (2d Cir. 2007)................................................................13

*United Indus. Corp. v. Clorox Co.*,
140 F.3d 1175 (8th Cir. 1998) ................................................................10, 14, 18

*W.L. Gore & Assoc., Inc. v. Totes, Inc.*,
788 F. Supp. 800 (D. Del. 1992)................................................................11, 13, 15

*Walker Mfg., Inc. v. Hoffmann, Inc.*,
220 F. Supp. 2d 1024 (N.D. Iowa 2002)................................................................15

*Zurn Constructors, Inc. v. B.F. Goodrich Co.*,
685 F. Supp. 1172 (D. Kan. 1988) ................................................................18

**Page(s)**

**STATUTES**

15 U.S.C. § 43(a) ...................................................................................................10, 14

15 U.S.C. § 1114(1)(a)..................................................................................................16

15 U.S.C. § 1125(a)(1)(B) .............................................................................................9

**RULES**

Fed. R. Evid. 201 ...........................................................................................................3

**OTHER AUTHORITIES**

http://www.ispot.tv/ad/7dk0/turbotax-master-plumber ..................................................5

http://www.ispot.tv/ad/7dkF/turbotax-return-expert.......................................................5

James Wm. Moore, *et al., Moore's Federal Practice* ¶ 65.36 (3d ed. 1999) .................8

Case 4:13-cv-00072-FJG   Document 7   Filed 01/25/13   Page 5 of 26

## I.       __INTRODUCTION__

Plaintiffs H&R Block Eastern Enterprises, Inc., HRB Innovations, Inc., and H&R Block Enterprises LLC ("Plaintiffs"), all members of the H&R Block, Inc. corporate family (collectively, "H&R Block"), submit these Suggestions in support of their Motion for Temporary Restraining Order and Request for Preliminary Injunction to prevent Defendant Intuit, Inc. from continuing to make false, misleading and deceptive representations of fact in its nationwide advertising campaign for its TurboTax product as described more fully in Section II.C herein (the "Campaign"), and from continuing to use H&R Block's registered and protected trademark "H&R Block" (the "Mark") in conjunction with the Campaign.

Immediate and decisive action is required because Plaintiffs are likely to succeed in showing that Defendant is making literally false—as well as misleading and false in context—claims about its product and H&R Block's products and services.  If left unchecked, the Campaign will continue to cause H&R Block to suffer grave and irreparable harm.  Defendant has commenced its misinformation strategy at a critical time of year—the beginning of "tax season," the roughly twelve-week period leading up to April 15 during which the vast majority of business is done by companies operating in the consumer tax return-related industry.  Each day that the Campaign goes unchecked, consumers will be lured to Defendant's product under the false pretense that it is a superior, more popular and "more trusted" method for completing a tax return, and consumers will be improperly dissuaded from using Plaintiffs' services and products based on the false impression that H&R Block tax preparers are unskilled and not "real tax experts," or both.   Moreover, the public's interest in truthful advertising, fair competition and preservation of intellectual property (as well as H&R Block's particular interest in the preservation of its own reputation and goodwill) support the issuance of a TRO.

## II.    FACTUAL BACKGROUND

### A.    The Parties

Founded in 1955, H&R Block has been the leader in tax preparation services for nearly six decades.  (Ex. 1 (McAnarney Aff.), ¶ 4.)  Through the substantial efforts of H&R Block and its associates and franchisees, the "H&R Block®" name (the "Mark"), and distinctive shade of green associated therewith, have become a strong, widely-known and highly-regarded trademark symbolizing the H&R Block companies, their goods, services, excellent reputation, and substantial goodwill.  H&R Block offers a variety of goods and services in connection with its Mark, including in-office and online tax preparation services (including preparing, signing and filing client tax returns), as well as do-it-yourself tax preparation software.  (*Id.* at ¶ 9.)

Defendant Intuit is a competitor of H&R Block and provider of do-it-yourself tax preparation software sold under the brand name "TurboTax®".  Through a series of questions, TurboTax allows consumers to complete and file their own tax returns.  Unlike H&R Block, however, Intuit does not maintain any retail offices in which consumers can receive personal tax advice, or have their tax returns prepared, signed, and filed by an IRS-registered tax preparer. Instead, TurboTax provides its customers with a call-in number and e-mail access to tax advisors should they have questions about completing their tax returns.  These tax advisors generally do not prepare, sign or file customer tax returns.  Defendant nevertheless explicitly advertises its TurboTax product as an alternative to H&R Block's products and services.

### B.    Value of the H&R Block® Trademark

The substantial reputation and goodwill value built by H&R Block over the past half-century in its Mark is reflected in the choice by tens of millions of people each year to use H&R Block as their tax services provider.  Among H&R Block's efforts to increase the consuming public's awareness of and respect for H&R Block and to develop associated brand recognition in

2

the Mark, H&R Block routinely uses the Mark and variations thereof in, among other things, national advertising campaigns, community outreach programs and other endeavors. H&R Block has expended considerable resources towards maintaining and further developing its brand, with "advertising costs of continuing operations for fiscal years 2012, 2011 and 2010 totaled $278.8 million, $243.3 million and $235.9 million, respectively." (Ex. 3 (H&R Block 2012 10-K) at p. 49.)[1] As a result of H&R Block's extensive efforts, the Mark has become a famous symbol of the H&R Block companies. In fact, the H&R Block brand has over 95% brand awareness in the United States. (Ex. 1 (McAnarney Aff.), ¶ 7.)

In order to protect its interests in the Mark, H&R Block has federally registered the Mark and variations thereof with the U.S. Patent and Trademark Office. (*See, e.g.*, Ex. 4 (printouts from the U.S. Patent and Trademark Office's ("PTO") Trademark Electronic Search System reflecting (1) 22 live federally-registered marks owned by H&R Block that include variations of the Mark and (2) detailed information regarding PTO Registration No. 2533014).) One of these variations is the famous green square logo that appears on thousands of office-fronts nationwide.



### C.    Defendant's False and Misleading Advertising Campaign

In a shameless effort to unfairly promote its TurboTax product at a critical point in time (the beginning of tax season), Defendant recently launched a nationwide advertising Campaign that uses Plaintiffs' Mark in a manner that casts false, misleading, and baseless aspersions on H&R Block's services and the qualifications of its personnel. The Campaign presently consists of two televised advertisements—referred to as the "Master Plumber" and "Return Expert"

---

[1] Plaintiffs respectfully request that, pursuant to Rule 201 of the Federal Rules of Evidence, the Court take judicial notice of Exhibits 3 through 12 attached hereto.

commercials[2]—and at least one press release that makes similar assertions.[3]

In the "Master Plumber" commercial, a man and a woman (presumably a husband and wife) are standing in a kitchen while a plumber in a blue work shirt sits on the floor, appearing to be working on the pipes under the sink (screenshot below). The following dialogue then ensues:



- Presumed Husband:       Hey.
- Presumed Wife:             Hey, honey!
- "Plumber":                    Hey, Alan!
- Presumed Husband:       Uh . . . hey
- "Plumber":                    I'm Bob. We talked at the tax store; I did your taxes.
- Presumed Husband:       I . . . I thought you were a tax expert.
- "Plumber":                    Today I'm a master plumber.

In the "Return Expert" commercial, a woman in a store is standing in front of a mirror holding a grey jacket, while another woman dressed like a department store sales associate approaches her (screenshot below). The following dialogue then ensues:

---

[2] Transcripts of the commercials are attached hereto as Exs. 11 ("Master Plumber") and 12 ("Return Expert"), and the video files are attached to the Affidavit of Cathy Wells. (Ex. 2 (Wells Aff.), ¶ 4, Ex. A (DVDs of Ads).)
[3] The scope of the Campaign is clearly still evolving and may also involve Internet advertising.

4



TurboTax TV Spot, 'Return Expert'

- Presumed Sales Associate:   That would be perfect on you, Catherine!
- Presumed Customer:          Have we met?
- Presumed Sales Associate:   Last week at the tax store; I did  your taxes!
- Presumed Customer:          You work here, too?
- Presumed Sales Associate:   Yep!
- Presumed Customer:          I thought you were an expert with returns?
- Presumed Sales Associate:   Oh, I am—especially after the holidays.

These commercials apparently commenced running on or about January 21, 2013 and, in less than three days since then, they have been aired hundreds of times in media markets nationwide on a broad range of television stations, including CBS, NBC, ABC, Fox, ESPN, Bravo, and TBS to name a few.  (*See, e.g*., Ex. 2 (Wells Aff.), ¶¶  5–7, Exs. B, C (DVDs of Ads));  Ex. 5 ("Master Plumber" iSpot data showing 153 airings as of 11:34 a.m. PDT on January 24, 2013, which can be accessed at http://www.ispot.tv/ad/7dk0/turbotax-master-plumber); and Ex. 6 ("Return Expert" iSpot data showing 179 airings as of 11:38 a.m. PDT on January 24, 2013, which can be accessed at http://www.ispot.tv/ad/7dkF/turbotax-return-expert).)  In fact, between January 21 and 23, 2013, Defendant spent more than $1 million to air these advertisements.  (Ex. 2 (Wells Aff.), ¶¶ 6–7, Exs. B, C.)

By the Campaign generally, and the two television commercials specifically, Defendant seeks to promote its TurboTax software by making numerous claims about itself and H&R Block

that are patently false, and is utilizing these advertisements to misappropriate H&R Block's famous Mark to bolster such claims. The claims at issue are explained below, all of which are literally false. (*See* Section IV.A.1, *infra*.)

      ***First***, in both television advertisements, Defendant claims that "more Americans trusted their federal taxes to TurboTax last year than H&R Block stores and all other major tax stores combined." Defendant makes this claim through a voiceover while displaying for the viewer a large graphic of two three-dimensional towers purportedly depicting (through their height) the false and misleading fact that more "Americans trusted their federal taxes to TurboTax last year than H&R Block stores and all other major tax stores combined." As depicted below (by way of a screenshot from one of Defendant's advertisements), Defendant's chart contains two towers.



The first tower is red—TurboTax's branded color—and bears the TurboTax trademarked logo. It rises high to the top of the graphic. The second tower is almost entirely green— notably, the same distinctive shade of green utilized in H&R Block's Mark—and displays the H&R Block Mark. It falls well below the red tower, and only rises slightly higher when the graphic adds a small gray section at the bottom to reflect "major tax stores" other than H&R Block. As the above-illustration reveals, the second tower is unquestionably overshadowed by TurboTax's red

tower.  None of these assertions are borne out by the actual facts.

**Second**, while making the above-described false statement and displaying the related graphic regarding the number of Americans who "trusted" their taxes to TurboTax last year as compared to H&R Block stores and other major tax stores, Defendant displays a disclaimer at the bottom of the screen.  It states that the statement and graphic are "based on U.S. sales & industry estimates for in-store returns prepared through 4/30/12."  As explained in greater detail below, this claim is literally false and highly misleading because, *inter alia*, TurboTax does not prepare any "**in-store**" tax returns as it does not have any stores, nor does it even "**prepare**" returns.

**Third**, both cited television advertisements unquestionably aver that those who prepare taxes at H&R Block and other "major tax stores" are not "tax experts."  In one ad, an incredulous customer asks his plumber, who also prepared his taxes at "the tax store," "I thought you were a tax expert."  The plumber replies:  "Today I'm a master plumber."  In the other advertisement, a seemingly disgusted department store customer asks (after learning that the ditsy department store clerk who is assisting her with her retail shopping needs also prepared her taxes at "the tax store"), "I . . . I thought you were a tax expert."  Defendant's obvious suggestion and outright insinuation is that tax professionals at H&R Block (the only mentioned "major tax store") are not tax experts—which, as will be shown, is a demonstrably false statement.

**Fourth**, the two cited advertisements also falsely suggest that H&R Block and other "major tax stores" hire only seasonal employees who have other jobs, such as plumbers and department store clerks, while Defendant only hires "real tax experts" who are not seasonal and work full-time at TurboTax.  Both statements are false, as shown below.

H&R Block has neither authorized nor consented to the use of its famous Mark in Defendant's deceptive Campaign.  On January 24, 2013 at approximately 3:01 p.m. PDT,

Plaintiffs demanded that Defendant immediately cease and desist its illegal conduct and requested a response by the close of business in California at 8:00 p.m. PDT. (Ex. 7 (Plaintiff's January 24, 2013 correspondence along with the facsimile confirmation).) As of the filing of these papers with the Court, Defendant has not agreed to cease the Campaign. Given the incredible and irreparable harm to the core of H&R Block's reputation and goodwill, Plaintiffs are therefore left with no choice but to seek an order from the Court to immediately enjoin Defendant's continued dissemination of the Campaign.

## III.   STANDARD FOR GRANTING INJUNCTIVE RELIEF

Plaintiffs request that this Court issue a temporary restraining order, a preliminary injunction and a permanent injunction to prevent further irreparable injury to H&R Block by immediately halting Defendant's patently false and misleading advertising Campaign that is both unlawful and contains numerous unauthorized uses of H&R Block's intellectual property.

District courts possess "broad discretion when ruling on preliminary injunction requests." *Emerson Elec. Co. v. Rogers*, 418 F.3d 841, 844 (8th Cir. 2005) (affirming district court's issuance of preliminary injunction). The factors to be considered in issuing a temporary restraining order are similar to those examined in determining the merits of a motion for preliminary injunction. James Wm. Moore, *et al., Moore's Federal Practice* ¶ 65.36 (3d ed. 1999). The propriety of injunctive relief is based on consideration of the following four factors: (1) the probability that the movant will succeed on the merits; (2) the threat of irreparable harm to the movant; (3) the balance between this harm and the injury that granting the injunction will inflict on other interested parties; and (4) whether issuing the injunction is in the public interest. *Sanborn Mf'g Co., Inc., v. Campbell Hausfeld/Scott Fetzer Co.*, 997 F.2d 484, 485–86 (8th Cir. 1993) (citing *Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 114 (8th Cir. 1981)).

No one factor is dispositive. Rather, all factors must be considered to determine whether

the balance weighs toward granting the injunction. *Dakota Indus., Inc., v. Dakota Sportswear, Inc.*, 988 F.2d 61, 64 (8th Cir. 1993). In the case at hand, however, ***all*** of these considerations weigh in favor of granting preliminary relief in this case. Accordingly, H&R Block respectfully submits that the Court should grant its Motion for a Temporary Restraining Order until this matter can be fully presented at a preliminary injunction hearing.

## IV.  H&R BLOCK IS LIKELY TO SUCCEED ON THE MERITS

In order to satisfy the requirement concerning likely success on the merits, a movant need not prove the merits, but must bring forth only "serious questions of law and fact" which deserve to be investigated, if the balance of the hardship tips in favor of the movant. *N.I.S. Corp. v. Swindle*, 724 F.2d 707, 710 (8th Cir. 1984); *Dataphase Sys.*, 640 F.2d at 113. The very nature of preliminary relief militates against a rigid application of the success-on-the-merits test because "[a]t base, the question is whether the balance of equities so favors the movant that justice requires the court to intervene to preserve the status quo until the merits are determined." *Id.* Here, H&R Block can demonstrate a high likelihood of success on the merits, far surpassing the requisite minimal standard set forth in *Dataphase*.

### A.  Defendant's False and Misleading Campaign Constitutes False Advertising and Unfair Competition Under Federal Law

The Lanham Act imposes liability for false advertising and unfair competition upon:

> [a]ny person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which . . . in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities. 15 U.S.C. § 1125(a)(1)(B).

To establish a claim for false advertising under the Lanham Act, H&R Block must show that: 1) Defendant made false statements of fact about its own product or another's product; 2)

Defendant's statement "actually deceived" or had the "tendency to deceive a substantial segment" of its audience; 3) the deception created was material; 4) Defendant caused the false statement to enter interstate commerce; and 5) H&R Block has been or is likely to be injured as a result of Intuit's false advertisement. *Allsup, Inc. v. Advantage 2000 Consultants Inc*., 428 F.3d 1135, 1138 (8th Cir. 2005) (citing *United Indus. Corp. v. Clorox Co.*, 140 F.3d 1175, 1180 (8th Cir. 1998)). Given the literal falsity and demonstrably misleading nature of the claims in the nationwide Campaign, all of the foregoing requirements are likely to be met here.

### 1. Defendant's Advertisements Are Literally False.

Under Section 43(a), there are two relevant categories of actionable statements: (1) literally false factual commercial claims; and (2) literally true or ambiguous factual claims "which implicitly convey a false impression, are misleading in context, or [are] likely to deceive consumers." *Ethex Corp. v. First Horizon Pharm. Corp.*, 228 F. Supp. 2d 1048, 1056 (E.D. Mo. 2002) (citing *United Indus. Corp.*, 140 F.3d at 1180). When the advertising is literally false, consumer confusion need not be proved. *Rhone-Poulenc Rorer Pharm., Inc. v. Marion Merrell Dow, Inc*., 93 F.3d 511, 516 (8th Cir. 1996).

First, Defendant's claim that "[m]ore Americans trusted their federal taxes to TurboTax last year than . . . H&R Block stores and all other major tax stores combined," paired with the two-tower graphic comparison are literally false. In fact, Defendant's own publicly available records indicate that during its fiscal year 2012, the number of do-it-yourself tax returns completed through Turbo Tax was *25.3 million*. (*See* Ex. 8 (Intuit Fact Sheet) at p. 2.) By contrast, the number of tax returns prepared by or through H&R Block and just two other major tax return preparation companies, Jackson Hewitt and Liberty, was in excess of *26.5 million*[4]

---

[4] The vast majority of such of the prepared returns—over 22 million—were prepared by H&R Block and its franchisees in the United States. (Ex. 1, (McAnarney Aff.), ¶ 4, Ex. A.)

over the same or similar 2012 period—a number that obviously surpasses the number of returns

Defendant reports were completed through TurboTax in 2012.  (*See* Ex. 3 (H&R Block 2012 10-

K) at p. 49); Ex. 9 (Jackson Hewitt Health Insurance Exchange Toolkit) at p. 3); and Ex. 10 (JTH

Holding, Inc. 10-K) at p. 6).)  *See S.C. Johnson & Sons, Inc. v. Clorox Co.*, 930 F. Supp. 753,

786 (2d Cir. 1996); *Castrol, Inc. v. Pennzoil Co.*, 799 F. Supp. 424, 441 (D. N.J. 1992) (granting

injunctive relief to enjoin advertisements making false factual claims).

Second, regardless of whether data exist to support Defendant's assertion that its software

is used or "trusted" by more Americans to prepare their returns than the services of Plaintiffs

"and all other major tax stores combined"—which it does not—data are being reported in a false

and misleading manner.  *See W.L. Gore & Assoc., Inc. v. Totes, Inc.*, 788 F. Supp. 800, 808 (D.

Del. 1992) ("The claims are only partially correct and, therefore, they are literally false.").  In

both commercials used in the Campaign, a small printed disclaimer appearing beneath the red

and green bar graphs reads:  "Comparison based on U.S. sales & industry estimates for in-store

returns prepared through 4/30/12."  This statement is false and intentionally misleading.  For

example, Defendant appears to be excluding the U.S. returns prepared by taxpayers using

competing do-it-yourself software products, including a product sold by H&R Block—a

particularly egregious exclusion when Defendant only offers a do-it-yourself software product.

Simply put, the Defendant has excluded the very product and services of H&R Block with which

it directly competes and which are the most analogous to Defendant's product.  Moreover,

Defendant's supposed disclaimer and graphic are independently false and misleading because

they purport to compare a ***non-existent*** TurboTax physical store to the actual in-store services

provided by H&R Block.  To be an accurate comparison of the number of returns that were

prepared using Turbo Tax versus the services of H&R Block, the graphic under which the

disclaimer is displayed would have to indicate that TurboTax prepared *zero* in-store tax returns in 2012 while H&R Block prepared many millions.

Not only does Defendant exclude H&R Block's do-it-yourself software products from its market analysis, but it equates the "assistance" provided by the TurboTax product to the full tax return preparation services available in H&R Block's retail offices. That is a false and highly misleading assertion. Whereas H&R Block prepares, reviews, and signs clients' tax returns prepared *in person* in its retail offices, Defendant's product does none of those things. Moreover, TurboTax does not prepare *any* "in-store" tax returns (nor does it prepare tax return in any other setting) as the disclaimer falsely suggest; in fact, since its inception, and certainly within the relevant time-period, TurboTax prepared a grand total of zero in-store tax returns, whereas during the same time-period, H&R Block prepared millions.

Third, Defendant's strongly-worded suggestion that those who prepare taxes at H&R Block and other "major tax stores" are not "tax experts" is likewise literally false. The average H&R Block client works with a tax professional who has more than eight years of experience and 450 hours of training; even first-year H&R Block tax professionals have over 75 hours of tax training before serving any clients; and H&R Block tax professionals, on average, complete approximately 44 hours of continuing education annually. (*See* Ex. 1, (McAnarney Aff.), ¶¶ 11–14, Ex. C.)

Finally, Defendant's advertisements suggest to a reasonable consumer that tax preparation is not the primary occupation of H&R Block employees, while simultaneously suggesting that Defendant does not hire seasonal employees who may have other jobs. (*See* Section II.C *supra* at 7.) This falsely claims a distinction between Defendant's product and

Plaintiffs' services.[5]  As explained in the Complaint (at ¶ 42), Defendant likewise hires seasonal employees to serve as "tax advisors" to answer customers' questions.  (Ex. 1, (McAnarney Aff.), ¶ 16, Ex. D.)  In fact, Defendant's own solicitations for its tax advisor positions, some of which are ironically sent to the same H&R Block tax preparers it belittles as lacking tax expertise, state that ***"the Turbo Tax advisor role is a seasonal, work-from-home position."***  (*Id.*)

Under these circumstances, H&R Block's Lanham Act false advertising/unfair competition claim against Defendant is very strong, and has a high likelihood of success on the merits.  As such, this consideration weighs heavily in favor of immediately enjoining Defendant's unlawful conduct.  *See Time Warner Cable, Inc. v. DirecTV, Inc.*, 497 F.3d 144, 163 (2d Cir. 2007); *W.L. Gore & Assoc.*, 788 F. Supp. at 814–15 (granting injunctive relief to enjoin false and disparaging advertisements).

### 2. Defendant's Advertisements Have a Tendency to Deceive Consumers.

To establish the second element of a false advertising claim, a plaintiff must show that the challenged advertisements actually deceive or have a tendency to deceive consumers.  *Allsup, Inc.*, 428 F.3d at 1138.  However, when an advertisement is literally false—as in this case— consumer confusion and deception need not be proved.  *Rhone-Poulenc Rorer Pharm., Inc.*, 93 F.3d at 516.  Therefore, once H&R Block establishes that Defendant is running literally false advertisements, it has satisfied the first two elements for a Lanham Act claim.

### 3. Defendant's Advertisements Are Likely to Affect Purchasing Decisions.

To establish the third element of a false advertising claim, a plaintiff must show that the defendant's false advertising is likely to influence a reasonable consumer's purchasing decision.

---

[5] Defendant also falsely asserts that H&R Block "advertise[s] for preparers with no experience necessary."  H&R Block does no such thing.  In fact, H&R Block requires that all applicants must successfully complete an intensive income tax course or tax knowledge assessment to even prepare a basic return.  (Ex. 1 (McAnarney Aff.), ¶15.)

Again, however, where there are literally false advertisements, "the plaintiff need not prove that any of its customers were actually persuaded by the advertising." *EFCO Corp. v. Symons Corp.*, 219 F.3d 734, 740 (8th Cir. 2000) (citing *United Indus. Corp.*, 140 F.3d at 1180–81).

Even without the benefit of that presumption, a showing that Defendant's literally false advertising is likely to influence a reasonable consumer's purchasing decision is easily made in the case at bar. There is almost always a benefit to being able to say that you are the leader in an industry and that your employees have the greatest industry expertise. In that position, companies are naturally afforded a certain level of respect that is an inherent by-product of being an industry leader. Consumers naturally rationalize that the leader must be doing something right to have earned the trust of that many people. That rationalization is only enhanced by statements that purport that the leader has superior expertise to its competitors. With Defendant's offending advertisements, it is clearly trying to communicate that more people trust its product to do their taxes than H&R Block, and that therefore the consumer should too. If Defendant did not think that such statements would be material to a consumer's purchasing decision, it would not have wasted valuable time mentioning H&R Block's purported market position and tax expertise several times in its nationwide advertising Campaign. Defendant apparently thinks that by touting the purported wealth of its tax advisors' expertise in comparison to the plumbers and department store clerks that purportedly prepare taxes for H&R Block clients, consumers will be influenced to use Defendant's product over H&R Block's tax preparation services. Otherwise, Defendant would not have already spent more than $1 million in just three days to air these advertisements. (Ex. 2, (Welsh Aff.), ¶¶ 6–7, Exs. B, C.)

### 4. Defendant's Advertising Affects Interstate Commerce.

A party may bring a false advertising claim under Section 43(a) of the Lanham Act for advertising activities that, even if they are intrastate in nature, may have a substantial effect on

interstate commerce in the aggregate. *See Walker Mfg., Inc. v. Hoffmann, Inc.*, 220 F. Supp. 2d 1024, 1038 (N.D. Iowa 2002) (citing *Franchised Stores of New York, Inc. v. Winter*, 394 F.2d 664, 669 (2d Cir.1968)). Here Defendant's activities easily satisfy this standard. In less than two days (since January 21, 2013), Defendant's television advertisements have aired and continue to be aired hundreds of times in media markets nationwide on a broad range of television stations, including CBS, NBC, ABC, ESPN, Bravo, and TBS to name a few. (*See, e.g.*, Ex. 2, (Welsh Aff.), ¶¶ 5–7, Exs. B, C); Ex. 5 ("Master Plumber" Commercial Airing Data showing 153 airings as of 11:34 a.m. PDT on January 24, 2013); and Ex. 6 ("Return Expert" Commercial Airing Data showing 179 airings as of 11:38 a.m. PDT on January 24, 2013).). Moreover, Defendant offers its TurboTax products all over the country. Indeed, by its very nature, TurboTax's product affects interstate commerce by allowing consumers to electronically file their tax returns with the IRS.

### 5. H&R Block Will Be Injured by the Campaign.

The individual income tax preparation business is uniquely time-sensitive, as it is a seasonal business with the overwhelming percentage of clients filing their tax returns between mid to late January and April 15. For H&R Block, this means that the vast majority of its annual net tax preparation revenues are earned in this three-month period. And, in particular, a substantial portion of this revenue is earned during the compressed, peak period from late January through mid-February. For this reason, it is readily apparent that Defendant timed its Campaign to launch at this precise busiest—and most potentially damaging—time.

Simply put, Defendant is using false advertisements to divert business to itself and away from Plaintiffs. *See W.L. Gore & Assoc.*, 788 F. Supp. at 810 ("Irreparable injury does not require diversion of actual sales and it can include the loss of control of reputation, loss of trade, and loss of goodwill."); *see also McNeilab, Inc. v. American Home Products Corp.*, 848 F.2d 34,

38 (2d Cir. 1988) ("A misleading comparison to a specific competing product necessarily diminishes that product's value in the minds of the consumer."); *Porous Media Corp. v. Pall Corp.*, 110 F.3d 1329, 1336 (8th Cir. 1997) ("in comparative advertising cases where money damages are sought and where there exists proof of willful deception, as here, the reasoning of the injunction cases set forth primarily in . . . [*McNeilab*] is applicable").  While legitimate competition is an inherent part of a free market economy, here Defendant is competing unfairly.

Due to the unique circumstances related to tax season, every day that the Campaign continues to run is a day when H&R Block suffers irreparable harm far greater than other businesses that do not collect the vast majority of their revenues during this small segment of the year.  Moreover, to the extent consumers are being duped by the Campaign and Defendant acquires new customers as a result, the injury H&R Block will suffer is exacerbated.  H&R Block will not only lose those consumers for this tax season, it may lose them for future years, as many consumers tend to use the same tax preparation method year after year.

> **B.      Plaintiffs Are Likely to Prevail on Their Additional Claims for Trademark Infringement and Unfair Competition Under Missouri State Law**

H&R Block is also likely to prevail in its claims for trademark infringement and common law unfair competition against Defendant.  The Lanham Act establishes a cause of action for infringement as follows:

> Any person who shall, without the consent of the registrant use in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive . . . shall be liable in a civil action by the registrant for the remedies hereinafter provided [which include, among others, injunctive relief].

15 U.S.C. § 1114(1)(a).  Missouri's common law cause of action for unfair competition imposes liability in essentially the same circumstances.  *See, e.g.*, *Cornucopia, Inc. v. Wagman*, 710

16

S.W.2d 882, 888 (Mo. Ct. App. 1986) ("To constitute unfair competition in respect to a trade name two elements must be present. The name must have acquired the mentioned secondary meaning or significance that identifies the plaintiff, and the defendant must have unfairly used the name or a simulation of it to the prejudice of plaintiff's interests.") (citation omitted); *see also Pan American Realty Corp. v. Forest Park Manor, Inc.*, 431 S.W.2d 144, 149 (Mo. 1968) ("In order to make out a case of unfair competition it is not necessary to show that any person has been actually deceived by the defendant's conduct, it being sufficient to show that such deception will be the natural and probable result of his acts . . . ." (citation omitted)).

In the instant case, H&R Block is the registrant of 22 trademarks that consist of and include the "H&R Block" Mark. (*See* Section II.B *supra* at 3.) It is indisputable that H&R Block's Mark is strong, valid and protectable and is well-recognized by consumers as an indicia of the H&R Block companies, their services and their goodwill. It is further indisputable that Defendant is making use of the Mark in commerce (including in Missouri) in connection with its TurboTax advertising Campaign without H&R Block's consent. Moreover, Defendant's unauthorized uses of the Mark are likely to confuse and deceive consumers about the association, nature and quality of H&R Block's and Defendant's goods and services. In particular, as discussed above, Defendant's representations that "more Americans trusted their federal taxes to Turbo Tax last year than H&R Block stores and all other major tax stores combined" are flatly false and without basis. Defendant's attempts to deceive consumers in an effort to trade upon the goodwill established by H&R Block associated with its Mark, thus, constitutes trademark infringement under the Lanham Act as well as common law unfair competition.

## V. PLAINTIFFS WILL BE IRREPARABLY HARMED IF THE COURT DOES NOT GRANT THE INJUNCTIVE RELIEF SOUGHT

Where a challenged advertisement directly, but falsely, proclaims the superiority of a

defendant's product over a plaintiff's, irreparable injury may be presumed. *United Indus. Corp.*, 140 F.3d at 1183–84 (citing *McNeilab, Inc.*, 848 F.2d at 38); *see also Porous Media Corp.*, 110 F.3d at 1333. As detailed above (*see* IV.A.5, *supra*), "[a] misleading comparison to a specific competing product necessarily diminishes that product's value in the minds of the consumer." *McNeilab,* 848 F.2d at 38. In this case, Defendant's advertisements are not only literally false, the advertisements are especially egregious because they are literally false in relation to the invocation of H&R Block's name and goodwill.

Similarly, this Court can presume irreparable injury with H&R Block's trademark infringement claims. "When considering traditional trademark infringement, irreparable harm may be presumed from a finding of probable success in proving likelihood of confusion." *Am. Dairy Queen Corp. v. New Line Prods, Inc.*, 35 F. Supp. 2d 727, 729 (D. Minn. 1998) (quoting *Calvin Klein Cosmetics Corp. v. Lenox Laboratories*, 815 F.2d 500, 505 (8th Cir. 1987)).

Finally, even if H&R Block was not entitled to these presumptions, the circumstances here justify a finding of irreparable harm. Among other reasons, threats to business viability and competitive advantage constitute irreparable harm for purposes of a motion for injunctive relief. *Zurn Constructors, Inc. v. B.F. Goodrich Co.,* 685 F. Supp. 1172, 1181 (D. Kan. 1988). Additionally, the irreparable harm standard for injunctive relief is not necessarily met by any given quantity of harm, but rather by showing that quality of harm is irremediable by monetary damage award alone. *Id.* Here, the impact upon H&R Block's competitive edge during the peak of the tax preparation business cycle will be significant if injunctive relief is not awarded.

H&R Block has invested over half a century in cultivating a solid reputation for providing reliable tax preparation services to its customers. Through countless tax law changes and technological advances, H&R Block has persevered. Now through this advertising

Campaign, Defendant is essentially attempting to destroy what Block has built: trust, goodwill, and a loyal customer base. If this is allowed to happen, the harm truly will be immeasurable and irreparable. Immediate injunctive relief thus should and must be entered.

## VI. THE THREATENED INJURY OUTWEIGHS ANY HARM TO DEFENDANT

H&R Block seeks to preliminarily enjoin Defendant from disseminating false and misleading advertisements that bear the H&R Block Mark to the public. The requested restraining order would not impede Defendant from continuing its business or running alternative advertising Campaigns that do not use the H&R Block Mark and do not include the offending misrepresentations. *See Sports Design and Dev., Inc. v. Schonenboom*, 871 F. Supp. 1158, 1165 (N.D. Iowa 1995) ("A restraining order would not prevent [defendant] from producing or selling other types of fishing lures, or otherwise conducting business."). Defendant may incur some inconvenience in having to notify its media outlets of the need to use the non-offending advertisements, and there may even be some nominal expense involved with having to react to the injunctive relief. However, beyond the inconvenience and nominal expense, Defendant will suffer no harm if a preliminary injunction is entered.

On the other hand, the danger to H&R Block's reputation and goodwill, and the potentially irreversible loss of its market share, as well as the potential for confusing and deceiving the public, are in fact highly compelling interests. Accordingly, the balance of harms weighs heavily in favor of granting an injunction. *See Connelly v. ValueVision Media, Inc.*, 393 F. Supp. 2d 767, 777 (D. Minn. 2005) (finding balance favoring movant in false advertising claim where likelihood of success on merits established); *Sports Design*, 871 F. Supp. at 1165.

## VII. THE PUBLIC INTEREST STRONGLY FAVORS AN INJUNCTION HERE

The public's interest in being protected from misleading and deceptive advertisements is an overriding interest compelling injunctive relief in this case. *See Coca-Cola Co. v. Purdy*, 382

F.3d 774, 789 (8th Cir. Minn. 2004) ("danger of consumer deception warrants some regulation of trademark usage") (citation omitted).  It necessarily follows that stopping deceptive conduct—such as Intuit's false and misleading advertising Campaign—is in the public interest.

Further, "[i]nfringement of a trademark is inherently contrary to the public interest." *Connelly v. ValueVision Media, Inc.*, 393 F. Supp. 2d 767, 777 (D. Minn. 2005); *see also Sports Design*, 871 F. Supp. at 1165 ("The public has an interest in protecting the integrity of trademark and trade dress.").  In this case, "the public interest in avoiding confusion in the market due to trademark infringement weighs in favor of issuing injunctive relief for [plaintiffs]." *Mut. of Omaha Ins. Co. v. Novak*, 775 F.2d 247, 249 (8th Cir. 1985); *see also J & B Wholesale Distrib., Inc. v. Redux Beverages, LLC*, 621 F. Supp. 2d 678, 689 (D. Minn. 2007) ("[t]he public interest weighs in favor of protecting consumers against trademark infringement.").

This is not an effort to limit competition.  Competition is a vital part of a free-market economy.  But competition must be fair, at least insofar as the customer is concerned.  Plaintiffs do not contend that every one of Defendant's advertisements for TurboTax are false and misleading—just those involved in the Campaign.  With respect to those false and misleading advertisements, H&R Block has no choice but to protect its reputation and goodwill, and the public interest, through this motion.  Defendant should not be allowed to mislead customers into using Defendant's products for tax preparation by making false and deceptive statements.

## VIII.  <u>CONCLUSION</u>

For the foregoing reasons, Plaintiffs respectfully submit that this Motion should be GRANTED and the Court should enter an Order enjoining Defendant in accordance with the prayer for relief set forth in the Complaint.

**ORAL ARGUMENT RESPECTFULLY REQUESTED**

DATED:  January 24, 2013               Respectfully submitted,

**BERKOWITZ OLIVER WILLIAMS SHAW & EISENBRANDT, LLP**

BY  /s/ Anthony J. Durone
     Anthony J. Durone (MO Bar #43872)
     David F. Oliver (MO Bar #28065)
     Stacey R. Gilman (MO Bar # 55690)
     2600 Grand Boulevard Suite 1200
     Kansas City, Missouri  64108
     Telephone:  (816) 561-7007
     Facsimile:  (816) 561-1888
     adurone@berkowitzoliver.com
     doliver@berkowitzoliver.com
     sgilman@berkowitzoliver.com

     **O'MELVENY & MYERS LLP**
     Michael G. Yoder (to be admitted *pro hac vice*)
     Jeffrey Barker (to be admitted *pro hac vice*)
     Adam G. Levine (to be admitted *pro hac vice*)
     Stephanie Noble (to be admitted *pro hac vice*)
     610 Newport Center Drive, Suite 1700
     Newport Beach, California 92660
     Telephone:  (949) 760-9600
     Facsimile:  (949) 823-6994
     myoder@omm.com
     jbarker@omm.com
     alevine@omm.com
     snoble@omm.com

     **ATTORNEYS FOR PLAINTIFFS**

21